**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ZACHARY BOYD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 3367 |
| | ) | |
| U.S. BANK, N.A., AS TRUSTEE FOR SASCO | ) | Judge Feinerman |
| AAMES MORTGAGE LOAN TRUST, | ) | Magistrate Judge Keys |
| SERIES 2003-1, WILSHIRE CREDIT | ) | |
| CORPORATION, merged with BAC HOME | ) | |
| LOANS SERVICING, LP and now merged with | ) | |
| BANK OF AMERICA, N.A., successor by merger | ) | |
| to BAC HOME LOAN SERVICING, LP, | ) | |
| SAFEGUARD PROPERTIES, INC., and | ) | |
| PROPERTY FIELD SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | JURY DEMANDED |

## SECOND AMENDED CLASS ACTION COMPLAINT

1.      Plaintiff, Zachary Boyd, on behalf of himself and all similarly-situated individuals, complains against U.S. Bank, N.A., as Trustee for Sasco Aames Mortgage Loan Trust, Series 2003-1 ("U.S. Bank, as Trustee"), Wilshire Credit Corporation, merged with BAC Home Loans Servicing, LP and now merged with Bank of America, N.A., successor by merger to BAC Home Loans Servicing, LP ("Wilshire"), Safeguard Properties, Inc., and Property Field Services, Inc.

### The Foreclosure Crisis

2.      The United States Congress ascertained that one in eight U.S. mortgages are currently in foreclosure or default.[1]

3.      In 2009, there were 3,957,643 properties with foreclosure filings, a 21 percent

---

[1]      *See* Congressional Oversight Panel, Oct. 9, 2009 report at 3, *available at* http://cop.senate.gov/reports/library/report-100909-cop.cfm.

increase over 2008.[2]

4.      As of January 2010, Illinois had the fourth highest foreclosure rate in the country, with 18,120 properties in foreclosure, an increase of 25% percent from January 2009.[3]

5.      Slowing the foreclosure rate has been identified as a key step in the recovery of the real estate market and the overall economy.  The magnitude of the foreclosure crisis forced the federal government and several states to draft and pass comprehensive legislation to preserve home ownership, prevent and/or delay foreclosures, and stave off an economic collapse.[4]

**The Public Policy of the State of Illinois, as Specifically Expressed in Illinois' Legislative Response to the Foreclosure Onslaught: The Creation of the Illinois Homeowner Protection Act**

6.      The public policy of the State of Illinois has been expressed by the Illinois General Assembly in its response to the local foreclosure crisis, by its unanimous passage of the Illinois Homeowner Protection Act, 735 ILL. COMP. STAT. 5/15-1502.5, which went into effect on April 5, 2009.

7.      Under the Homeowner Protection Act, <u>before</u> instituting a foreclosure action, all lenders and servicers <u>shall</u> notify homeowners that are at least 30 days late on their mortgage payments that they have 30 days to seek housing counseling to get their loans back on track.

8.      Under the Illinois Homeowner Protection Act, if the homeowner enters counseling, he or she receives an additional 30-day grace period on foreclosure to work out a payment plan or refinance option.

---

[2]      *See* http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=8333.

[3]      *See* http://www.chicagobreakingbusiness.com/2010/02/illinois-foreclosures-up-25-from-year-ago.html.

[4]      *See* http://www.chicagobreakingbusiness.com/2010/02/illinois-foreclosures-up-25-from-year-ago.html.

9.      In any event, under this Act, at a minimum, the foreclosure action against the consumer is prohibited until 30 days after the initial required notice is sent and 60 days if the homeowner enters counseling.  The ultimate desired outcome is that, by advising homeowners of their rights to receive housing counseling, many initiated foreclosures could be avoided.

**The Federal Response to the Onslaught of Foreclosures: The Creation of HAMP**

10.      In response to this unprecedented economic crisis, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008, amending it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C. § 5201 *et seq.*

11.      The purpose of the Act is to restore liquidity and stability to the financial system; additionally, the legislation requires that the Act be implemented in a manner that "protects home values" and "preserves home ownership."  12 U.S.C. § 5201.

12.      The Act established the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  To this end, under TARP, the U.S. Government was to purchase assets and equity from financial institutions, including toxic securitized mortgages.  Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

13.      Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP"), a detailed program designed to avert the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to distressed borrowers who satisfied certain eligibility requirements.

14.      As a condition of obtaining money from the government under TARP, each and every financial institution/mortgage servicer was required to participate in HAMP, and offer HAMP loan modifications to eligible borrowers.

15.     More specifically, Bank of America, N.A. accepted $15,000,000,000.00 in TARP funds from the U.S. Government in October 2008.  In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America, N.A. accepted another $10,000,000,000.00 in TARP funds, along with a partial guarantee against losses on $118,000,000,000.00 in mortgage-related assets.

16.     As of November 2008, U.S. Bancorp had accepted $6.6 billion in TARP funds.[5]

17.     As of November 2008, Wilshire Credit Corporation accepted $62 million in TARP funds.[6]

18.     By accepting TARP funds, Defendants agreed that they would participate in TARP programs authorized by the Secretary of Treasury to minimize foreclosures.

19.     Additionally, U.S. Bank, N.A., Wilshire, and Bank of America, N.A. signed contracts referred to as Servicer Participation Agreements ("SPA") with the U.S. Treasury, attached as Exhibits A, B, and C respectively, in which they agreed to comply with HAMP's requirement to perform loan modifications and other foreclosure prevention services described in the HAMP guidelines.  These HAMP guidelines, which are issued by the Treasury Department, require the financial institutions to, among other things:

a.     Collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

b.     Use reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for HAMP, including in-person contacts at the servicer's discretion;

c.     Provide a modified loan with a reduced payment amount as per a mandated formula, known as the "loss mitigation waterfall," which is effective for a three-month trial period for borrowers that are eligible for modification;

---

[5]     *See* http://bailout.uslaw.com/?page_id=353.

[6]     *See* http://bailout.uslaw.com/?page_id=353.

    d.      Provide a permanent loan modification to those homeowners who successfully complete the three-month trial period; and

    e.      Provide written notices to every mortgage borrower that has been evaluated for a HAMP loan modification to inform the borrowers whether they were found eligible.  If ineligible, the financial institution is required to inform the borrower of the reasons for his or her ineligibility.

    20.      HAMP and its associated directives also prohibit certain conduct, including demanding upfront payments in order to be evaluated for a HAMP loan modification, instituting or continuing foreclosures while a borrower is being evaluated for a loan modification, and contain restrictions on the way a servicer may report the borrower to a credit reporting agency.

    21.      Though Defendants accepted billions of dollars in TARP funds and entered into contracts requiring them to comply with HAMP's directives and extend home loan modifications to distressed homeowners, Defendants systemically failed to comply with the terms of HAMP and its directives.

    22.      Wilshire and U.S. Bank, as Trustee, by and through their agents, acted unfairly and oppressively by choosing to foreclose against Plaintiff and other Illinois consumers while ignoring state foreclosure laws, the common law, and their obligations under federal law.

    23.      According to *Why Servicers Foreclose When they Should Modify*, written by Diane E. Thompson for the National Consumer Law Center October 2009, "servicers remain largely unaccountable for their dismal performance in making loan modifications."[7]  "Servicers have [the following] four main sources of income, listed in descending order of importance … [which] give servicers little incentive to offer sustainable loan modifications, and some incentive to push loans into foreclosure[:]"[8]

---

[7]      Thompson, Diane E., "*Why Servicers Foreclose When they Should Modify*," National Consumer Law Center, p. 4 (October 2009), attached as <u>Exhibit D</u>.

[8]      *Id.*

- The monthly servicing fee, a fixed percentage of the unpaid principal balance of the loans in the pool;
- Fees charged to borrowers in default, including late fees and "process management fees;"
- Float income, or interest income from the time between when the servicer collects the payment from the borrower and when it turns the payment over to the mortgage owner; and
- Income from investment interests in the pool of mortgage loans that the servicer is servicing.[9]

24.     Because of this business model, it is simply more profitable for servicers to have borrowers in default and foreclosure than to offer them HAMP loan modifications.

25.     Thus, instead of acting fairly and sending notices to consumers under the Illinois Homeowner Protection Act, evaluating distressed borrowers for HAMP loan modifications, and offering HAMP loans to those that qualified, *i.e.* what they were required to do in exchange for receiving billions of dollars from the federal government, Defendants have sought to circumvent these expressions of public policy by foreclosing.

26.     Moreover, Defendants have unfairly disregarded their common law obligations to deal in good faith and mitigate losses.  In fact, the Defendants' unnecessary foreclosure tactics constitute waste and increase local crime, while simultaneously decreasing communities' tax base and surrounding property values.

## PARTIES

27.     Zachary Boyd is an individual homeowner residing in Chicago, Illinois.  At all times relevant, the majority of the time, Boyd lived, slept, and ate his meals at his home located at 2839 West Lexington, the property that is the subject of this lawsuit.

28.     U.S. Bank is the Trustee for the Sasco Aames Mortgage Trust 2003-1 ("Trust")

---

[9]      *Id.* at pp. 17-23.

which, through its agent/mortgage servicer Wilshire Credit Corporation, merged with BAC Home Loans Servicing, LP and now merged with Bank of America, N.A., successor by merger to BAC Home Loans Servicing, LP, filed a foreclosure action on behalf of the Trust against Plaintiff in the Circuit Court of Cook County.

29.     Defendant Bank of America, N.A. is a mortgage servicer and full service bank incorporated under the laws of Delaware and, as of the filing of this lawsuit, retained Wilshire's mortgage servicing rights and related assets.

30.     Each of the Defendants' specific roles relating to the conduct complained of is in the knowledge of the Defendants.  As a result, only discovery obtained from the Defendants will reveal the actual capacity in which each defendant (or all Defendants) is responsible for the complained of conduct.  Therefore, Wilshire is alleged, upon information and belief, to have committed the acts complained of individually and on behalf of U.S. Bank as Trustee for the Sasco Aames Mortgage Trust 2003-1.   U.S. Bank as Trustee for the Sasco Aames Mortgage Trust 2003-1 is alleged to be liable for the complained of conduct based upon the acts of its agents acting for its benefit.

31.     Defendant Safeguard Properties, Inc. was retained by Wilshire to perform property inspection and preservation services.  Defendant Safeguard Properties, Inc. claims to be the largest privately held mortgage field services company in the country.  Headquartered in Cleveland, Ohio and founded in 1990 by Robert Klein, Safeguard inspects and maintains defaulted and foreclosed properties for a wide range of clients in the mortgage industry, from local loan servicing companies to national publicly traded mortgage servicing corporations.  The company has grown from a regional preservation company with a few employees and a handful of contractors performing services in the Midwest, to a national company providing services in

50 states, the Virgin Islands, and Puerto Rico. Safeguard is supported by a nationwide network of subcontractors trained and qualified to perform all requested superintendence, preservation and maintenance functions anywhere in the country.

32.     Defendant Property Field Services, Inc. is an Illinois corporation located at 9325 S. Crandon, Chicago, IL 60617. On information and belief, Defendant Safeguard Properties, Inc. retained Defendant Property Field Services, Inc. as one of its "subcontractors trained and qualified to perform all requested superintendence, preservation and maintenance functions" for the property at issue in this case.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because it is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and at least one member of Class A is a citizen of a State different from any defendant against whom Count I is asserted.

34.     Supplemental jurisdiction over the state law claims exists under 28 U.S.C. § 1367.

35.     Venue of this action properly lies in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) and (c), inasmuch as the unlawful practices are alleged to have been committed in this district, and Defendants have sufficient minimum contacts with this state and otherwise intentionally avail themselves to consumers in this state through the promotion, marketing, and sale of their services in this state, such that the exercise of jurisdiction by this Court is permissible under traditional notions of fair play and substantial justice, and the named Plaintiff resides in this district.

## Facts Specific to Zachary Boyd

36.     On July 1, 2003, Plaintiff Zachary Boyd entered into two home loans, numbers

334956 and 309679, with Aames Funding Corporation d/b/a Aames Homes Loan. Plaintiff's loans were aggregated with other similar mortgage loans, transferred to Lehman Brothers Holdings Inc., and sold to Structured Asset Securities Corporation ("*Sasco*"). Subsequently, Sasco conveyed the mortgage loans to a Trust for which U.S. Bank is Trustee.

37.     On or about October 2003, Wilshire began servicing Plaintiff's loans.

38.     Bank of America later purchased the servicing rights from Wilshire and began servicing Plaintiff's loans.

39.     While continually making his payments over the years, after experiencing financial hardship like numerous others in Illinois, Plaintiff could no longer afford to make the mortgage payments on his home. On information and belief, Plaintiff's last accepted payment on the loans was made on March 12, 2009.

40.     As of August 21, 2009, Plaintiff was more than 60 days late on his mortgage payments.

41.     The servicer, on behalf of U.S. Bank, as Trustee, initiated a foreclosure action against Plaintiff on August 21, 2009, in the Circuit Court of Cook County, Case No. 2009-CH-29647.

42.     The foreclosure action, Case No. 2009-CH-29647, is currently pending before the Circuit Court of Cook County.

43.     In that foreclosure action, Case No. 2009-CH-29647, U.S. Bank, as Trustee, represented to the Plaintiff under 735 ILCS 5/15-1504.5 that "the lawful occupants of a home have the right to live in the home until a judge enters an order for possession." (Emphasis added).

44.     In its foreclosure action, U.S. Bank, as Trustee, asked: "that should the subject

9

property be <u>vacant</u>, the Plaintiff may seek to have the Court find that the property is <u>abandoned</u> pursuant to 735 ILCS 5/15-1603, Illinois Code of Civil Procedure."  (Emphasis added).

45.     As a result of filing its pending case in the Circuit Court of Cook County, Case No. 2009-CH-29647, U.S. Bank, as Trustee, subjected the issue of "vacancy" or "abandonment" to the state court.

46.     On or about September 29, 2009, Plaintiff called Greenpath, Inc., a certified HUD housing counselor, to assist him in requesting a HAMP loan modification from Defendants.

47.     Plaintiff and a Greenpath representative, Maria A. Cieslak, called Wilshire on September 29, 2009.  The parties to the telephone call discussed issues concerning the Plaintiff's loan and property, and Plaintiff sought a HAMP loan modification "among other things."

48.     In this September 29, 2009 conversation, Plaintiff informed Defendants that the loan modification was needed as a result of Plaintiff's financial hardships.[10]

49.     In the course of this September 29, 2009 conversation, Defendants requested, and Plaintiff provided, the financial information that was requested by Wilshire to evaluate and determine Plaintiff's eligibility for a HAMP loan modification.  At the end of this conversation, Plaintiff believed that Defendants would soon let him know if he was eligible or qualified for the HAMP loan modification.

50.     Plaintiff contends that, at minimum, at the point in time at which Wilshire admits it obtained "limited amount of financial information" from the Plaintiff, Defendants should have

---

[10]     According to the applicable SPA, "[i]f the servicer determines that a non-defaulted borrower facing a financial hardship is in Imminent Default and will be unable to make his or her mortgage payment in the immediate future, the servicer must apply the NPV Test," a test to see whether a modification is required.  Additionally, a request for a loan modification under HAMP requires the immediate cessation of any foreclosure proceedings against the borrower.  *See* HAMP Guidelines, attached as <u>Exhibit E</u>, at p. 3; *see also* Supplemental Directive 09-01, attached as <u>Exhibit F</u>, at p. 14. Supplemental Directive 09-08 is attached as <u>Exhibit G</u>.

suspended all activity on Plaintiff's account until Wilshire could determine if Plaintiff was a candidate for a HAMP loan modification and notify him of such.

51.     Instead of suspending all actions against the Plaintiff while Wilshire was reviewing Plaintiff's eligibility for a HAMP loan modification or, at minimum, contacting Safeguard Properties, Inc. and/or Property Field Services, Inc. to inform them Plaintiff had not "abandoned" the property, Defendants proceeded unremittingly.

52.     As a result, instead of even briefly stopping to see if Plaintiff qualified for a HAMP loan modification, or informing Plaintiff what, if anything, he needed to do to be further considered for HAMP, and/or explaining to Plaintiff any reason he was ineligible for a HAMP loan modification, the next day, Defendants' agents broke into Plaintiff's property and took possession of it by padlocking the gate and putting a lock on the front door, unfairly and oppressively dispossessing Plaintiff from his property without notice, due process or a court order. On information and belief, these agents had been hired through a "middle-man" (Safeguard Properties, Inc.) who in turn retained Property Field Services, Inc.

53.     In response to Plaintiff's September 29, 2009 request for a loan modification, activity on Plaintiff's account was not paused until Defendants could inform Plaintiff of his eligibility/ineligibility (either in accordance with contractual notions of good faith and fair dealing or under Defendants' respective obligations under their SPAs). Thus, Defendants' act of relentlessly dispossessing Plaintiff from the property (before informing him of their position) was unfair, unconscionable, and oppressive. Plaintiff's claim is that his eligibility for a loan modification is not at issue because during Defendants' evaluation period, Defendants unfairly failed to suspend their collection/foreclosure activities.

54.     Defendants' actions were additionally and independently unfair, unconscionable,

and oppressive in that Defendants summarily took possession of Plaintiff's property (whether it was his personal residence, a rental property or otherwise) without notice. The Mortgage expressly contemplates the borrower's right to rent all or parts of the property, and does not provide that failing to rent the property consistently is a condition of default, let alone an automatic forfeiture of the property without notice. Plaintiff asserts that Defendants lack any contractual right to summarily take possession of Plaintiff's property if the property is merely "vacant of tenants." Plaintiff was never provided with notice that Defendants had a present belief that Plaintiff's property was "vacant" and/or "abandoned" and that such belief would entitle them to summarily take possession of Plaintiff's property without a court determination. Plaintiff was damaged by Defendants' unfair and oppressive conduct of unilaterally dispossessing Plaintiff from his property without due process and/or a judicial determination as to the property being "vacant" and/or "abandoned" and entitling Defendants to possession.

55.     Defendants' actions were additionally and independently unfair, unconscionable, and oppressive in that Defendants summarily took possession of Plaintiff's property without a court determination. Defendant U.S. Bank, as Trustee, and its servicer submitted the issue of pre-judgment possession of the Plaintiff's property to the Circuit Court of Cook County in the currently pending foreclosure action, Case No. 2009-CH-29647. Under 735 ILCS 5/15-1103, once a foreclosure lawsuit is filed, the jurisdiction of the court "continues during the entire pendency of the foreclosure and until disposition of all matters arising out of the foreclosure." (Emphasis added). Further, in Defendants' pending state foreclosure action U.S. Bank, as Trustee, asked: "that should the subject property be vacant, the Plaintiff may seek to have the Court find that the property is abandoned pursuant to 735 ILCS 5/15-1603, Illinois Code of Civil Procedure." (Emphasis added). Thus as a result, not only did U.S. Bank, as Trustee, subject the

12

issue before the court, but its lawyers identified the distinction between "vacancy" and "abandonment."

56.     Defendants' actions were additionally and independently unfair, unconscionable, and oppressive in that in Case No. 2009-CH-29647, U.S. Bank, as Trustee, represented to the Plaintiff under 735 ILCS 5/15-1504.5 that "the lawful occupants of a home have the right to live in the home <u>until a judge enters an order for possession</u>."  (Emphasis added).  As 735 ILCS 5/15-1104 states that "any person who … who knowingly gives such occupants false and misleading information, or who harasses or intimidates such occupants, with the intent of inducing such occupants to abandon the mortgaged premises … shall be guilty of a Class B misdemeanor," Plaintiff contends that the representations made in the pleadings of the state foreclosure are inconsistent, materially misleading and/or deceptive in light of Defendants' subsequent acts of summarily dispossessing the Plaintiff from his property without a court order.

57.     Defendants' actions were additionally and independently unfair, unconscionable, and oppressive in that Defendants summarily took possession of Plaintiff's property when Defendants knew that Plaintiff could not have "abandoned"  the property, as that term is used in the Plaintiff's Mortgage, by virtue of Defendants being on notice of (amongst other things) that: a) Plaintiff had appeared to defend the state foreclosure action in the Circuit Court of Cook County, Case No. 2009-CH-29647; b) Plaintiff made calls to Wilshire, including but not limited to his call of September 29, 2009, in an effort to keep the property; c) Defendants had voluminous evidence that the property was being maintained and otherwise tended to by the Plaintiff; d) the doors and windows of the property were locked; e) there was a "for rent" sign in the window from the Plaintiff as landlord of the property with the Plaintiff's phone number prominently displayed; and f) at the time of entry, the lights to the property were on.

58.     The actions of Defendants, individually and through their agents, breaking and entering into and upon Plaintiff's property and going through the rooms of his property was unfair, unconscionable, and oppressive.

59.     Plaintiff was never given a response, verbally or in writing, to his September 29, 2009 request for a HAMP loan modification.

60.     Plaintiff was never given any notice whatsoever that his house would be entered by Defendants' agents and that his door would be padlocked.

61.     As a result of Defendants' conduct, Plaintiff suffered pecuniary and emotional damages.

**Defendants' Routine and Regular Failure To Act In Good Faith, Perform Their Obligations Under Illinois Law, the Common Law, Their SPA Agreements, and Federal Law Constitutes Direct Evidence of Defendants' Unfair and Deceptive Conduct in Contravention of the Consumer Protection Statutes of Illinois and the Several States**

62.     Plaintiff's claims regarding Defendants' unfair and deceptive conduct are simple and evidenced by the circumstances surrounding their actions – Defendants received billions of dollars of federal TARP funds under the guise that they would help distressed borrowers by offering HAMP loan modifications, but have failed to do so and, in many instances, including the Plaintiff's, did not even pause to evaluate whether consumers were eligible for such a modification in their stalwart march towards foreclosure.

63.     Defendants damaged and acted unfairly and oppressively towards Plaintiff and the members of the proposed classes as evidenced by their total disregard of their duty under state and federal law and in some cases, direct attempts to completely circumvent such law.

64.     Despite Defendants' obligations under the law and their respective SPAs, Defendants breached said obligations to provide Plaintiff and similarly-situated homeowners meaningful evaluations for loan modifications, as evidenced by the fact that Defendants did not

14

pause to evaluate whether Plaintiff was eligible, prior to taking possession of his property without notice or a court order.

65.    Defendants acted unfairly and oppressively by prematurely or unnecessarily initiating and maintaining foreclosure proceedings. without pausing to even consider homeowners' eligibility for the loan modification program.  By not providing consumers who were being foreclosed upon respite long enough to even perform the simple review for eligibility, let alone a loan modification evaluation or reporting the results of such a review or evaluation, Defendants have unfairly, unscrupulously and oppressively deprived other similarly situated homeowners of their rights.

66.    Defendants' conduct of failing to fully comply with state and federal laws when proceeding with foreclosures is unfair and oppressive.

67.    As a result of Defendants' conduct hundreds, if not thousands, of homeowners similarly situated to Plaintiff have been and continue to be wrongfully deprived of an opportunity to stay in their homes, pay their mortgages, and maintain their credit.  Further, these homeowners have been prematurely deprived of their home ownership while Defendants circumvent state and federal law.

### COUNT I
*Unfair Conduct under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/2, ("ICFA") Brought By Plaintiff, Individually, and on Behalf of the Members of Class A Against Wilshire and U.S. Bank, as Trustee*

68.    Plaintiff incorporates herein by reference Paragraphs 1 through 67.

69.    This Count is brought on behalf of Plaintiff and the members of a class, Class A. Class A consists of all persons in the State of Illinois who: a) were delinquent on their mortgage payments; b) against whom Wilshire (on behalf of its principals, such as, in this case, U.S Bank as Trustee for Sasco Aames Mortgage loan trust series 2003-1) proceeded with a foreclosure

action; c) prior to Wilshire providing the borrower with an evaluation of eligibility for a loan modification. The class is so numerous that joinder of all individual members in one action would be impracticable.

70. Plaintiff's claims are typical of the claims of the class members. All are based upon the same legal theories and arise from the same unlawful conduct.

71. There are common questions of law and fact affecting the members of the class, which common questions predominate over questions that may affect individual members. These common questions include, but are not limited to, whether Defendants violated the ICFA by engaging in unfair conduct that violated the public policy of this state, federal guidelines enacted by Congress, and common law. This unfair conduct is evidenced by, among other things:

    a.      failing to evaluate eligible, distressed homeowners under HAMP;

    b.      failing to evaluate eligible loans under HAMP;

    c.      failing to abide by its duty of good faith and fair dealing by prematurely foreclosing on homes; and

    d.      failing to mitigate damages by acting to further depress home prices.

72. Plaintiff will fairly and adequately represent the members of Class A. Plaintiff has no interest that conflicts with the interests of the class members. Plaintiff has retained counsel experienced in handling consumer class actions. Neither Plaintiff nor his counsel has any interests that might cause them to not pursue this claim vigorously.

73. This action should be maintained as a class action because the prosecution of separate actions by individual members of Class A would create a risk of inconsistent or varying adjudications with respect to individual members that would establish incompatible standards of conduct for the parties opposing the Class.

16

74.     Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to Class A as a whole.

75.     Instead of complying with the law and taking the legally required steps that would have allowed Plaintiff and the members of Class A to retain and/or attempt to retain their homes, Defendants prematurely instituted foreclosure proceedings against them.

76.     Illinois, federal, and common law require mortgagors/servicers such as Defendants to take steps to aid Plaintiff and the members of Class A in retaining their homes, even when borrowers are behind on their payments.

77.     Additionally, under HAMP, Defendants were required to:

[U]se reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for the HAMP, including in-person contacts at the servicer's discretion. Servicers must not conduct foreclosure sales on loans previously referred to foreclosure or refer new loans to foreclosure during the 30-day period that the borrower has to submit documents evidencing an intent to accept the trial period plan offer.

Supplemental Directive 09-01, attached as Exhibit F.

78.     Upon information and belief, Defendants made no such efforts to notify distressed mortgagees of HAMP or make reasonable efforts to contact borrowers regarding their eligibility for HAMP.  And in so doing, Defendants failed to comply with their duty of good faith and failed to mitigate their damages by prematurely instituting foreclosure proceedings and/or failing to suspend such proceedings pending a HAMP evaluation.[11]

79.     In sum, instead of providing Plaintiff and the members of Class A with any of the above information and the opportunity to save their homes, Defendants failed to comply with

---

[11]     Under the HAMP guidelines, Defendants are required to: 1) evaluate at-risk borrowers for HAMP prior to instituting a foreclosure proceeding; and 2) suspend any foreclosure action during the time a borrower is being considered for HAMP eligibility.  See Exhibit E, at pp. 3, 14.

federal, state, and common law, and wrongfully sped up the foreclosure process. Such conduct constitutes unfair conduct prohibited by the ICFA.

80.     Section 2 of the ICFA states, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including but not limited to the use or employment of
> any deception fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon the
> concealment, suppression or omission of such material fact[.]

81.     Defendants' conduct violates public policy as such policy is evidenced in the numerous steps taken by lawmakers to preserve home ownership and protect home values. Instead of complying with the state and federal laws, Defendants chose to foreclose, without first attempting to mitigate damages.

82.     Defendants' conduct is immoral, unscrupulous, unconscionable, and unethical in that, instead of taking steps that would allow Plaintiff and the members of Class A to keep their homes, they prematurely instituted foreclosure proceedings. In so doing, Defendants deprived Plaintiff and the members of Class A from obtaining, among other things, housing counseling or even a HAMP loan modification, both governmental programs aimed at preserving home ownership. By failing to comply, Defendants also wrongfully sped up the foreclosure process as counseling or HAMP evaluation would have suspended foreclosure proceedings.

83.     Such conduct is especially unethical given that the simple act of performing any of these legal requirements would save countless consumers from losing their homes, preserve Defendants' assets, and preserve neighborhoods from an excessive number of vacant homes. All of these are stated goals of the Illinois and federal laws aimed at easing the foreclosure crisis.

84.     Complying with these requirements is not an overly onerous or burdensome duty for Defendants. However, the consequence of Defendants' failure to do so is catastrophic for

18

homeowners.

85.     Defendants caused Plaintiff and the members of <u>Class A</u> substantial damage in that, among other things: (a) Plaintiff and the members of <u>Class A</u> were unfairly subjected to additional credit damage; and (b) they were deprived of the suspension of foreclosure proceedings and their right to be evaluated for loan modifications, and thus denied the time and resources to allow them to fairly negotiate a plan to stay in their homes.

86.     Defendants' conduct occurred in the course of trade or commerce.

WHEREFORE, Plaintiff Zachary Boyd and the members of <u>Class A</u> pray for the following relief against Defendants:

a)      Injunctive relief as appropriate;

b)      Actual and punitive damages under the Illinois Consumer Fraud Act, 815 ILL. COMP. STAT. 505/10;

c)      Reasonable attorneys' fees and costs of this proceeding; and

d)      Such other and further relief as this Court may deem just and proper.

### <u>COUNT II</u>
*Unfair and Deceptive Conduct under the ICFA, 815 ILL. COMP. STAT. 505/2, Brought By Plaintiff, Individually, and on Behalf of the Members of <u>Class B,</u> Against All Defendants*

87.     Plaintiff incorporates herein by reference Paragraphs 1 through 67.

88.     This Count is brought on behalf of Plaintiff and the members of a class, <u>Class B</u>. <u>Class B</u> consists of all persons living in the State of Illinois who: a) were living in their homes when the Defendants physically dispossessed the borrowers from their homes; b) prior to the issuance of a finding of abandonment or order of possession or judgment of foreclosure and sale and confirmation of sale pursuant to 735 ILL. COMP. STAT. 5/15-1508.

89.     On information and belief, the class is so numerous that joinder of all individual

members in one action would be impracticable.

90.     Plaintiff's claims are typical of the claims of the class members.  All are based

upon the same legal theories and arise from the same unlawful conduct.

91.     There are common questions of law and fact affecting members of the class,

which common questions predominate over questions that may affect individual members.

These common questions include, but are not limited to:

a.     Whether Defendants have a practice of dispossessing borrowers from their homes
prior to a judgment of foreclosure; and

b.     Whether Defendants' pre-judgment dispossession constitutes an unfair practice.

92.     Plaintiff will fairly and adequately represent the members of <u>Class B</u>.  Plaintiff

has no interest that conflicts with the interests of the class members.  Plaintiff has retained

counsel experienced in handling consumer class actions.  Neither Plaintiff nor his counsel has

any interests that might cause them to not pursue this claim vigorously.

93.     This action should be maintained as a class action because the prosecution of

separate actions by individual members of <u>Class B</u> would create a risk of inconsistent or varying

adjudications with respect to individual members that would establish incompatible standards of

conduct for the parties opposing the Class.

94.     Defendants have acted or refused to act on grounds generally applicable to the

Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with

respect to <u>Class B</u> as a whole.

95.     At all relevant times, Plaintiff and the members of <u>Class B</u> were in possession of

their homes and never provided notice to the Defendants and/or their agents that they

relinquished their right to quiet enjoyment of the property.

96.     At all relevant times, Plaintiff and the members of <u>Class B</u> had not abandoned

20

their properties or otherwise demonstrated that they had given up their rights to the properties.

97.     Defendants never provided Plaintiff and the members of Class B with reasonable notice that they were going to dispossess them from their home without a court order.

98.     Plaintiff and the members of Class B had an absolute right to their property as Defendants never obtained any judicial order of possession nor did they have any indication of abandonment.

99.     In Illinois, after a judgment of foreclosure has been entered, only then can a sale of the home occur.  Under 735 ILL. COMP. STAT. 5/15-1508, after the court order approving the sale, the consumer-homeowner has 30 days to vacate the premises.

100.    However, before a judgment of foreclosure had been entered, Defendants hired persons to break into Plaintiff's and the members of Class B's homes and padlock their doors.

101.    Defendants have a regular and routine practice of hiring such agents without notice to the consumer prior to a judgment in foreclosure and without a pre-judgment order permitting the action.

102.    Defendants' uniform conduct, as described above, constitutes unfair conduct under the ICFA.

103.    Defendants' attempt to take possession of the property was unethical, immoral, oppressive, and unscrupulous in that, among other things, it was done without authority to do so and deprived Plaintiff and the members of Class B of their right to remain in their homes.

104.    Defendants' uniform conduct is not just unfair but it is also deceptive because the mortgage foreclosure summons advised homeowners that, "The lawful occupants of a home have the right to live in the home until a judge enters an order for possession."

105.    Plaintiff and the members of Class B were substantially damaged as result of

Defendants' conduct in that, among other things, they were dispossessed from their homes.

106.    Defendants' conduct occurred in the course of trade or commerce.

WHEREFORE, Plaintiff Zachary Boyd and the members of <u>Class B</u> pray for the

following relief against Defendants:

a)    Injunctive relief as appropriate;

b)    Actual and punitive damages under the Illinois Consumer Fraud Act, 815 ILL.
      COMP. STAT. 505/10;

c)    Reasonable attorneys' fees and costs of this proceeding; and

d)    Such other and further relief as this Court may deem just and proper.

## COUNT III
### *Trespass, Brought By Plaintiff, Individually, Against all Defendants*

107.    Plaintiff incorporates herein by reference Paragraphs 1 through 67.

108.    Plaintiff was in exclusive possession of his home and never relinquished his rights

to quiet enjoyment of the property.

109.    Plaintiff never abandoned his property and never indicated in any way that he had

given up his rights to such property or knowingly relinquished control over it. To the contrary,

Defendants knew that the Plaintiff was not giving up his absolute right and exclusive possession

to his property prior to invading his property because, amongst other things, the day before the

invasion Plaintiff had called and spoken with a representative of the Defendants to seek

modification of his loan under HAMP.

110.    At all relevant times, Plaintiff had an absolute right and exclusive possession to

his property as Defendants never obtained any judicial order of possession or judicial

confirmation of sale, and Defendants knew with a substantial degree of certainty that entering the

property would result in an intrusion upon Plaintiff's possessory rights and his personal

sanctuary.

111.     The mortgage foreclosure summons states, "You continue to own your home until the court rules otherwise."

112.     The mortgage foreclosure summons further states, "The lawful occupants of a home have the right to live in the home until a judge enters an order for possession.  In most cases, if you continue to live in your home, you will have at least nine (9) months before you have to move."

113.     Defendants' employees or agents intentionally entered into Plaintiff's home without justification and without authorization when Plaintiff's home was not, and did not appear to be, abandoned.

114.     Defendants used their employees or agents to break into Plaintiff's home and padlock his doors prior to any judicial order granting them authority to do so, without permission or authority from the Plaintiff.

115.     While Plaintiff had not timely paid under the mortgage, Defendants knew at the time they sent their employees or agents to enter the Plaintiff's home that they had no right to effectuate the equivalent of a pre-foreclosure, non-judicial dispossession solely for Plaintiff's failure to pay under the mortgage.

116.     The fact that Defendants' employees or agents had to break existing locks to gain access to the Plaintiff's home evidences that the entry was neither peaceful nor limited to the stated intended purpose of securing the home.

117.     Defendants knew or should have known that sending employees or agents to break into Plaintiff's home and padlock his doors would result in an intrusion.

118.     Plaintiff was damaged as a result of Defendants' conduct in that his property was

damaged and he was dispossessed of his home.

WHEREFORE, Plaintiff Zachary Boyd prays for the following relief against all Defendants:

a)      Actual and punitive damages; and

b)      Such other and further relief as this Court may deem just and proper.

### COUNT IV
***Invasion of Privacy, Brought By Plaintiff, Individually, Against all Defendants***

119.    Plaintiff incorporates herein by reference Paragraphs 1 through 67.

120.    Plaintiff was in possession of his private home and never provided notice to Defendants that he relinquished his right to quiet enjoyment of the property.

121.    Defendants sent their agents to enter into Plaintiff's home without Plaintiff's authorization.

122.    Defendants' intrusion into Plaintiff's private home was unauthorized and without any legal basis.

123.    Plaintiff's home is a private residence that contains his personal private effects, and as such, Plaintiff locks his door in an effort to keep the personal information and effects in his home private.

124.    Defendants' agents did not just enter his home, see that it was occupied and leave.

125.    Instead, Defendants' agents trespassed into the Plaintiff's home and went through Plaintiff's kitchen cabinets and into his bathrooms.

126.    It was apparent upon the Plaintiff's return to his house that his personal affairs and boundaries had been subject to the prying eyes of Defendants' agents in that they had not merely entered the house but had gone through his personal effects.

127.    Defendants' intrusion into Plaintiff's privacy and into his personal property

24

contained in the home is extremely offensive and shocking to a reasonable person.

128.    Defendants' conduct caused Plaintiff actual damages, anguish, and suffering.

WHEREFORE, Plaintiff Zachary Boyd prays for the following relief against all

Defendants:

a)    Actual and punitive damages; and

b)    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class Members, demand a trial by jury.

Respectfully submitted,


By: /s/ Lance A. Raphael__
One of Plaintiff's Attorneys

Lance A. Raphael
Stacy M. Bardo
Allison Krumhorn
The Consumer Advocacy Center, P.C.
180 W. Washington St., Suite. 700
Chicago, IL 60602
(312) 782-5808

Christopher Kruger
The Law Offices of Christopher Kruger
2022 Dodge Avenue
Evanston, IL 60201
(847) 420-1763

Alex Volkov
Volkov & Berezin
555 Skokie Blvd., Suite 500
Northbrook, IL 60062
(847) 504-4008